CLIFFORD CHANCE US LLP
Jennifer C. DeMarco
Michelle M. McGreal
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

| | |
|---|---|
| **In re:** | **Chapter 15** |
| | |
| **CODERE FINANCE 2 (UK) LIMITED,** | **Case No. 20-_____ (__)** |
| | |
| **Debtor in a Foreign Proceeding.** [1] | |

-------------------------------------------------------- x

**MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING,**
**(II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF**
**SANCTION ORDER AND RELATED SCHEME AND (IV) RELATED RELIEF**
**UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1] Codere Finance 2 (UK) Limited is incorporated and registered in England and Wales with company number 12748135.  The Company has its registered office at Suite 1, 3rd Floor, 11-12 St. James Square, London, SW1Y 4LB.

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED ........................................................................................................ 1

JURISDICTION ................................................................................................................. 2

BACKGROUND ................................................................................................................ 3

    A.    The Debtor's Business Operations ......................................................... 3

    B.    Summary of the Group's Pre-Scheme Capital Structure ...................... 4

    C.    Events Preceding Commencement of the English Proceeding .............. 6

    D.    Description of the Scheme .................................................................... 11

    E.    The English Proceeding ....................................................................... 13

ARGUMENT ................................................................................................................... 17

    A.    The English Proceeding is Entitled to Recognition Pursuant to Section 1517 of the Bankruptcy Code as a Foreign Main Proceeding ...................................... 17

        1.    The Debtor is Eligible to be a Debtor under the Bankruptcy Code ......... 18

        2.    The English Proceeding is a "Foreign Proceeding" ................................. 19

        3.    The English Proceeding is a "Foreign Main Proceeding" ....................... 23

        4.    The Petitioner is a "Foreign Representative" ........................................... 25

        5.    The Foreign Representative Properly Commenced this Chapter 15 Case ........................................................................................................ 26

    B.    The Debtor Is Entitled to Automatic Relief Under 11 U.S.C. § 1520 ................. 27

    C.    Enforcement of the English Orders and Scheme and Related Discretionary Relief Is Proper ..................................................................... 28

        1.    The Court May Grant the Requested Relief Pursuant to Section 1521 .... 31

        2.    The Court May Grant the Requested Relief Pursuant to Section 1507 .... 33

        3.    Injunctive Relief is Appropriate ............................................................... 35

    D.    The Relief Requested Is Not "Manifestly Contrary to the Public Policy of the United States." ........................................................................... 37

    E.    Chapter 15 Case Closure ..................................................................... 41

NOTICE .......................................................................................................................... 42

NO PRIOR REQUEST ..................................................................................................... 42

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C.V.)*,
  470 B.R. 408 (N.D. Tex. 2012) ............................................................................... 26
*Canada S. Ry. Co. v. Gebhard*,
  109 U.S. 527 (1883) ............................................................................................... 35
*Clarkson v. Coughlin*,
  898 F. Supp. 1019 (S.D.N.Y. 1995) ....................................................................... 35
*Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983) ................................................................................ 22
*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
  773 F.2d 452 (2d Cir. 1985) .................................................................................. 34
*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
  737 F.3d 238 (2d Cir. 2013) .................................................................................. 18
*In re A.H. Robins Co.*,
  219 B.R. 145 (10th Cir. 1998) ............................................................................... 41
*In re ABC Learning Centres Ltd.*,
  445 B.R. 318 (Bankr. D. Del. 2010) ...................................................................... 21
*In re Agrokor D.D.*,
  591 B.R. 163 (Bankr. S.D.N.Y. 2018) ............................................................. 29, 40
*In re Arctic Glacier Int'l, Inc.*,
  901 F.3d 162 (3d Cir. 2018) .................................................................................. 29
*In re Artimm, S.r.L.*,
  335 B.R. 149 (Bankr. C.D. Cal. 2005) ................................................................... 31
*In re Ashapura Minechem Ltd.*,
  480 B.R. 129 (S.D.N.Y. 2012) ............................................................................... 20
*In re Atlas Shipping*,
  404 B.R. 726 (Bankr. S.D.N.Y. 2009) ............................................................. 32, 34
*In re Avanti Commc'ns*,
  582 B.R. 603 (Bankr. S.D.N.Y. 2018) ............................................................. passim
*In re B.C.I. Fins. Pty Ltd.*,
  583 B.R. 288 (Bankr. S.D.N.Y. 2018) ................................................................... 18
*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  389 B.R. 325 (S.D.N.Y. 2008) ............................................................................... 34
*In re Bear Stearns*,
  374 B.R. 122 (Bankr. S.D.N.Y 2007) ..................................................................... 24
*In re Berau Capital Res. Pte Ltd*,
  540 B.R. 80 (Bankr. S.D.N.Y. 2015) ..................................................................... 19
*In re Betcorp Ltd.*,
  400 B.R. 266 (Bankr. D. Nev. 2009) 20, 21, 24

*In re Board of Dirs. of Hopewell Int'l Ins. Ltd.*,
  238 B.R. 25 (Bankr. S.D.N.Y. 1999) ................................................................ 21, 36
*In re Brierley*,
  145 B.R. 151 (Bankr. S.D.N.Y. 1992) ................................................................ 35, 36
*In re British Isle of Venice (BVI), Ltd.*,
  441 B.R. 713 (Bankr. S.D. Fla. 2010) ................................................................ 38
*In re Cell C Proprietary*,
  571 B.R. 542 (Bankr. S.D.N.Y. 2017) ................................................................ 19, 28
*In re Cenargo Int'l PLC*,
  294 B.R. 571 (Bankr. S.D.N.Y. 2003) ................................................................ 18
*In re Culmer*,
  25 B.R. 621 (Bankr. S.D.N.Y. 1992) ................................................................ 32
*In re ENNIA Caribe Holding N.V.*,
  No. 18-12908 (MG) 2019 WL 365749 (Bankr. S.D.N.Y. Jan. 29, 2019) ................................................................ 31
*In re Ephedra Products Liab. Litig.*,
  349 B.R. 333 (Bankr. S.D.N.Y. 2006) ................................................................ 39
*In re Fairfield Sentry Ltd.*,
  458 B.R. 665 (S.D.N.Y. 2011) ................................................................ 41
*In re Foreign Economic Industrial Bank Ltd, "Vneshprombank"*,
  607 B.R. 160 (Bankr. S.D.N.Y. 2019) ................................................................ 18
*In re Garcia Avila*,
  296 B.R. 95 (Bankr. S.D.N.Y. 2003) ................................................................ 35
*In re Lines*,
  81 B.R. 267 (Bankr. S.D.N.Y. 1988) ................................................................ 35
*In re Magyar Telecom B.V.*, No. 13-13508-SHL,
  2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013) ................................................................ 23, 30
*In re Metcalfe & Mansfield Alt. Invs.*,
  421 B.R. 685 (Bankr. S.D.N.Y. 2010) ................................................................ 34, 36, 38, 39
*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
  458 B.R. 63 (Bankr. S.D.N.Y. 2011) ................................................................ 24
*In re Millennium Global Emerging Credit Master Fund Ltd.*,
  474 B.R. 88 (S.D.N.Y. 2012) ................................................................ 24
*In re MMG LLC*,
  256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................ 35
*In re OAS S.A.*,
  533 B.R. 83 (Bankr. S.D.N.Y. 2015) ................................................................ 38
*In re Ocean Rig UDW Inc.*,
  570 B.R. 687 (Bankr. S.D.N.Y. 2017) ................................................................ 19, 28
*In re Octaviar Administration Pty Ltd*,
  511 B.R. 372– (Bankr. S.D.N.Y. 2014) ................................................................ 18
*In re P.T. Bakrie Telecom TBK*,
  601 B.R. 702 (Bankr. S.D.N.Y. 2019) ................................................................ 19
*In re Poymanov*,
  571 B.R. 24 (Bankr. S.D.N.Y. 2017) ................................................................ 19
*In re Rede Energia S.A.*,
  515 B.R. 69 (Bankr. S.D.N.Y. 2014) ................................................................ 28, 29, 36, 38

*In re Rubin*,
   160 B.R. 269 (Bankr. S.D.N.Y. 1993) ................................................................ 35
*In re Sino-Forest Corp.*,
   501 B.R. 655 (Bankr. S.D.N.Y. 2013) .................................................... 29, 36, 39
*In re SPhinX, Ltd.*,
   351 B.R. 103 (Bankr. S.D.N.Y. 2006) ................................................................ 24
*In re Toft*,
   453 B.R. 186 (Bankr. S.D.N.Y. 2011) ................................................................ 37
*In re U.S. Steel Canada Inc.*,
   571 B.R. 600 (Bankr. S.D.N.Y. 2017) .......................................................... 19, 28
*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
   714 F.3d 127 (2d Cir. 2013) .......................................................................... 24, 37
*The Argo Fund Ltd. V. Bd. of Dirs. of Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A.
   (In re Bd. of Dirs. of Telecom Arg., S.A.)*,
   528 F.3d 162 (2d Cir. 2008) .............................................................. 28, 32, 36, 38
*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
   825 F.2d 709 (2d Cir. 1987) .......................................................................... 34, 35

**Statutes**

11 U.S.C. § 101(15) ............................................................................................ 6
11 U.S.C. § 101(23) ...................................................................................... 19, 20
11 U.S.C. § 101(24) .................................................................................. *passim*
11 U.S.C. § 109 ........................................................................................ 17, 18, 3
11 U.S.C. § 109(a) ........................................................................................ 18, 19
11 U.S.C. § 304 ............................................................................................ 20, 36
11 U.S.C. § 306 ................................................................................................... 7
11 U.S.C. § 350(a) ......................................................................................... 2, 42
11 U.S.C. § 350(b) ............................................................................................... 2
11 U.S.C. § 362 ................................................................................................... 5
11 U.S.C. § 362(a) ............................................................................................. 27
11 U.S.C. § 362(o) ............................................................................................... 5
11 U.S.C. § 509 ................................................................................................... 3
11 U.S.C. § 1501 ..................................................................................... 2, 32, 37
11 U.S.C. § 1502(4) ...................................................................................... 23, 25
11 U.S.C. § 1506 .......................................................................................... 37, 38
11 U.S.C. § 1507 ................................................................................. 1, 27, 32, 33
11 U.S.C. § 1507(b) ............................................................................................ 33
11 U.S.C. § 1510 ................................................................................................. 1
11 U.S.C. § 1515 ............................................................................... 1, 3, 17, 26, 27
11 U.S.C. § 1515(a) ........................................................................................... 26
11 U.S.C. § 1515(b) ........................................................................................... 26
11 U.S.C. § 1516(b) ........................................................................................... 27
11 U.S.C. § 1516(c) ........................................................................................... 23
11 U.S.C. § 1517 ........................................................................................... 1, 17
11 U.S.C. §1517(a)(1)-(3) .................................................................................. 17
11 U.S.C. § 1517(b)(1) ....................................................................................... 23

11 U.S.C. § 1517(d) ............................................................................................ 2, 41
11 U.S.C. § 1519 ................................................................................................ 26, 33
11 U.S.C. § 1519(a) .................................................................................................. 31
11 U.S.C. § 1520 ............................................................................................ 1, 27, 31
11 U.S.C. § 1521 .................................................................................... 1, 28, 31, 33
11 U.S.C. § 1520(a) ...................................................................................... 27, 30, 31
11 U.S.C. § 1521(a) .............................................................................................. 30, 31
11 U.S.C. § 1522 ........................................................................................................ 1
11 U.S.C. § 1522(a) ...................................................................................... 1, 30, 31
11 U.S.C. § 1504 ........................................................................................... 1, 3, 26
28 U.S.C. § 157(b)(2) .................................................................................................. 2
28 U.S.C. § 157(b)(2)(P) ............................................................................................ 3
28 U.S.C. § 1410 ........................................................................................................ 3
28 U.S.C. §§ 1334 ...................................................................................................... 3

## Rules

Fed. R. Bankr. P. 5009(c) ....................................................................................... 41
Fed. R. Bankr. P. 1007(a)(4) ............................................................................. 2, 26
Fed. R. Bankr. P. 7007.1 ..................................................................................... 2, 27

## Other Authorities

109 Cong., 1st Sess. 2005 ........................................................................................ 47
H. Rep. No. 109-31, pt. 1, at 116 (2005) ............................................................... 38

Manuel Martínez-Fidalgo, in his capacity as the foreign representative (the **"Petitioner"**) of Codere Finance 2 (UK) Limited (the **"Debtor"** or the **"Company"**), which is the subject of proceedings (the **"English Proceeding"**) before the High Court of Justice, Business and Property Courts of England and Wales, Insolvency and Companies Court (the **"English Court"**) pursuant to Part 26 of the Companies Act 2006 of England and Wales (the **"Companies Act"**) concerning a scheme of arrangement (the **"Scheme"**), by and through his undersigned counsel, hereby respectfully submits this *Motion for (i) Recognition of Foreign Main Proceeding, (ii) Recognition of Foreign Representative, (iii) Recognition of Sanction Order and Related Scheme and (iv) Related Relief Under Chapter 15 of the Bankruptcy Code* (the **"Motion"** and, together with the Official Form 401 Petition filed contemporaneously herewith, the **"Chapter 15 Petition"**) and represents as follows.

## RELIEF REQUESTED

1.       Pursuant to this Motion, the Petitioner respectfully requests, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521 and 1522 of title 11 of the United States Code (the **"Bankruptcy Code"**), entry of an order substantially in the form attached hereto as **<u>Exhibit A</u>** (the **"Proposed Recognition Order"**) (i) recognizing the English Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code; (ii) recognizing Manuel Martínez-Fidalgo or, if failing him, Matthew Charles Turner (either party, as applicable, the **"Foreign Representative"**) as a "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding; (iii) recognizing, granting comity to and giving full force and effect in the United States to the English Proceeding, the Scheme and the English Orders (as defined below); (iv) enjoining parties from taking any action inconsistent with the Scheme or the English Orders in the United States; and (v) granting such other relief as the

Court deems just and proper.  In addition, the Petitioner respectfully requests, pursuant to sections 350(a) and 1517(d) of the Bankruptcy Code, authorization to seek entry of an order (the "**Proposed Final Order**"), the form of which is attached hereto as **Exhibit B**, to close this chapter 15 case upon notice of presentment and deeming this Motion to be the final report required to be filed by the Foreign Representative.  The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

2.      In support of the Chapter 15 Petition, the Petitioner refers the Court to the statements contained in: (a) the *Declaration of Manuel Martínez-Fidalgo in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Foreign Representative Declaration**"), (b) the *Declaration of Iain White in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**White Declaration**"),[2] and (c) the *Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3,* all of which have been filed contemporaneously herewith and are incorporated herein by reference.

## **JURISDICTION**

3.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code, as well as the *Amended Standing Order of Reference* dated January 31, 2012,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Scheme Document (as defined below).  The Scheme Document is included as Exhibit B to the White Declaration.

Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.      Venue is proper under 28 U.S.C. § 1410 as the Debtor has assets within the United States located in New York, as described further herein.

5.      The Foreign Representative has properly commenced this chapter 15 case under sections 1504 and 1509 of the Bankruptcy Code by the filing of a petition for recognition of the English Proceeding under section 1515 of the Bankruptcy Code.

## BACKGROUND

### A.      The Debtor's Business Operations

6.      The Company was incorporated and registered in England and Wales on July 16, 2020 and is a wholly owned subsidiary of Codere S.A. (the **"Parent"** and, together with the Company and the Parent's other subsidiaries, the **"Group"**),[3] a Spanish public limited company whose shares are listed on the Madrid stock exchange.

7.      The Group is a leading international gaming operator. As of February 29, 2020, the Group operated nearly 56,000 slot machines, more than 29,000 bingo seats and nearly 8,500 sports betting terminals in Latin America (Mexico, Argentina, Uruguay, Panama and Colombia), Spain and Italy, across various gaming venues, including 148 gaming halls, nearly 1,200 arcades, over 9,100 bars, 245 sports betting shops and four horse racetracks. The Group is also a provider of online gaming services in Spain, Mexico, Colombia and Panama.

---

[3] In 2015, Codere Finance (UK) Limited, a member of the Group at the time, was the subject of a chapter 15 case in connection with an English scheme of arrangement that was recognized and enforced by that certain *Order Granting Petition for Recognition of Foreign Main Proceeding and Request for Related Relief. See In re Codere Finance (UK) Limited*, Case No. 15-13017 (JLG) [ECF No. 16]. This entity no longer exists and the financing arrangements that were the subject of that scheme of arrangement are neither directly relevant to, nor affected by, the Scheme.

8.     The Group employs over 12,000 people worldwide.  It is the industry leader in terms of market share in the majority of its markets, with in excess of 3.6 million monthly visits (excluding visits to arcades and slot routes) reported as of January 2020.

**B.     Summary of the Group's Pre-Scheme Capital Structure**

9.     The Group has the following main financing arrangements in place:[4]

a.  *Existing Euro Notes*:  The Company and Codere Finance 2 (Luxembourg) S.A. (**"Codere Finance"**) are the co-issuers of EUR 500 million 6.750% senior secured notes due 2021 (*ISIN: XS1513765922*) (the **"Existing Euro Notes"**) pursuant to a New York law-governed indenture dated November 8, 2016 with GLAS Trust Corporation acting as the trustee (the **"Existing Notes Trustee"**) (as amended, modified or supplemented from time to time, the **"Existing Notes Indenture"**).

b.  *Existing Dollar Notes:* The Company and Codere Finance are the co-issuers of USD 300 million 7.625% senior secured notes due 2021 *(ISIN: XS1513776374*) (the **"Existing Dollar Notes"** and, together with the Existing Euro Notes, the **"Existing Notes"**) also pursuant to the Existing Notes Indenture.

c.  *RCF*: Codere Newco S.A.U. is the borrower under a EUR 95 million super senior revolving credit facilities agreement originally dated October 24, 2016 (as amended, modified or supplemented from time to time, the **"RCF"**) between, amongst others, the Parent, Codere Newco S.A.U., the lenders named therein (the **"RCF Lenders"**) and GLAS Trust Corporation Limited as the security agent (the **"RCF Agent"**).  The RCF is governed by English law and has a maturity date of November 15, 2020.

d.  *SBF*: Codere Newco S.A.U. and the Parent are the obligors under a EUR 50 million super senior surety bond facility agreement originally dated April 5, 2017 (the **"SBF"**) between, amongst others, the Parent, Codere Newco S.A.U., the other obligors named therein and Amtrust Europe Limited as the finance provider.  The SBF is governed by Spanish law and has no definitive maturity date but may terminate in accordance with its terms.

e.  *Interim Notes*: Codere Finance is the issuer of EUR 85 million super senior notes due September 2023 (the **"Interim Notes"**) pursuant to a New York law-governed indenture, as further described in paragraph 29 below.

---

[4] The Group is also party to numerous financing arrangements across its operating markets, which are neither directly relevant to, nor affected by, the Scheme.

10.    With respect to the Existing Notes, Codere Finance was the original issuer.  On July 23, 2020, the Company through its entry into an amendment and accession agreement became a co-obligor of all of Codere Finance's obligations under the Existing Notes Indenture and the Existing Notes and agreed to be bound by all of the provisions of the same on a primary, joint and several basis as if it had been an original party to the Existing Notes Indenture and the Existing Notes.

11.    The Existing Notes, the RCF, the SBF and the Interim Notes each benefit from substantially the same guarantee and security package granted by certain Group companies.  The SBF also benefits from cash collateral in respect of 11.5% of the amounts outstanding.

12.    The interrelationship between the Existing Notes, the RCF, the SBF and the Interim Notes (and the security and guarantees in relation thereto) is governed by an English law intercreditor agreement originally dated November 7, 2016, as most recently amended and restated on July 23, 2020, between, amongst others, the Parent and GLAS Trust Corporation Limited (as security agent) (the "**Intercreditor Agreement**").  GLAS Trustees Limited, as trustee for the holders of the Interim Notes, acceded to the Intercreditor Agreement on July 29, 2020.

13.    Pursuant to the terms of the Intercreditor Agreement, the RCF, the SBF and the Interim Notes rank senior to the Existing Notes with respect to the proceeds of any enforcement of security.  Under the Intercreditor Agreement, the RCF, the SBF and the Interim Notes rank *pari passu* amongst themselves, and the Existing Euro Notes and the Existing Dollar Notes rank *pari passu* amongst themselves.

14.    Pursuant to an agreement among lenders dated July 23, 2020, there are arrangements in place whereby the agent in respect of the Interim Notes will turn over any

enforcement proceeds to the RCF Lenders until the RCF is discharged, and amendments to certain terms of the Interim Notes will not be made without the consent of a majority of the RCF Lenders.

## C.    Events Preceding Commencement of the English Proceeding

15.    The Group's operations have been significantly disrupted by the Covid-19 pandemic and the resulting "lockdown" imposed in each of the Group's operating markets.  As explained by the Parent in various public announcements made during and since March 2020, the Group suffered a complete shutdown of its retail operations due to mandatory restrictions and lockdowns for several months.  While phased re-openings have been possible across some of the Group's markets, namely Italy, Spain, its racetracks in Uruguay and a few halls in Mexico, the majority of its operations remain closed.  Revenue levels in the reopened markets remain below those experienced prior to the start of the Covid-19 pandemic.

16.    Although the Group's online gaming offering has been able to operate throughout the period, this division only represented approximately 43% of sales in FY2019, and the suspension of major sports leagues and events worldwide as a result of the pandemic has negatively impacted sports betting activity via the Group's online facilities.

17.    The closure of the Group's physical locations for a long period coupled with lower revenue levels upon re-opening, and the fact that major live sporting events were, on the whole, suspended in a number of countries for several months, has had an adverse impact on the cash flow of the Group.

18.    The Group has taken extensive measures to mitigate the impact of the Covid-19 pandemic on its business wherever possible.  The nature and extent of such measures have been disclosed to Scheme Creditors (as defined below) and to the public, primarily through the issuance of four public statements relating to the Covid-19 pandemic and contingency planning, dated March 9, 2020, (the **"First Covid-19 Statement"**), March 16, 2020 (the **"Second Covid-19**

Statement"), March 23, 2020 (the "**Third Covid-19 Statement**"), April 27, 2020 (the "**Fourth**

**Covid-19 Statement**") and July 14, 2020 (the "**Fifth Covid-19 Statement**"), each of which appear

on the Group's website at https://www.grupocodere.com/en/shareholders-investors/cnmv-filings/,

and can be summarized as follows:

a.  In the First Covid-19 Statement, the Group confirmed that, given the measures taken by the Italian government, its 11 bingo halls in Italy would close for a period and its slot route operations in the country would be affected by reduced bar opening hours.

b.  Prior to the Second Covid-19 Statement, the Group took action to preserve its liquidity position and to ensure business continuity.  As set out in the Second Covid-19 Statement, such action included steps to achieve, among other things, a reduction in all non-critical activity in the Group's halls and headquarters (including operational and investment initiatives), the utilization of available credit lines (at local and corporate levels) and securing additional financing in Mexico (on March 13, 2020, the Group secured a MXN 500 million (c. EUR 20 million) bank loan with a maturity date falling in 2025), and prioritizing certain payments with a reduction in and/or delayed payment of fixed operating expenses such as gaming taxes, personnel costs, rents and supplies.

c.  In the Third Covid-19 Statement, the Group confirmed the closure of nearly all of its retail operations, and listed some additional measures that it had taken, including drawing on the remainder of the RCF, providing an additional EUR 41 million of liquidity and analyzing additional avenues to reduce costs, including by making use of local measures introduced in each jurisdiction to support companies affected by the pandemic, limiting cash outflows to critical items and extending payment terms.

d.  In the Fourth Covid-19 Statement, among other things, the Parent announced that, due to the complete shutdown of its retail operations and the lack of clarity around reopening (both in terms of timing and ongoing restrictions), the Group would look for financing options to raise approximately EUR 100 million.

e.  In the Fifth Covid-19 Statement, among other things, the Parent announced that it had, as expected, consumed EUR 20-25 million per month in meeting its fixed monthly costs while operations were closed.  The Group forecasted that, excluding cash trapped in Codere Italia S.p.A. and its subsidiaries and HRU S.A., one of the Parent's Uruguayan subsidiaries, its available cash would fall to c. EUR 21 million in July 2020.

19.    Despite the steps taken by the Group, it became evident that the Group would require an additional injection of funding to enable it to manage its short to medium-term cash flow position.  The enforced closure of its operations for a sustained period (a significant part of operations remain closed), and the regulations now in place in relation to social distancing, have had a significant impact on the Group's ability to generate revenue over the period which has, in turn, impacted its cash flow.  While the Group believes the impact on revenue levels and cash flow will be temporary and has taken significant steps to provide the Group with sufficient runway to return to normalized levels of free cash flow generation as it gradually reopens all its operations,[5] the Group urgently needs additional funding.

20.    Since April 2020, the Group and its advisers have been engaging with certain existing creditors and third-party finance providers to discuss the Group's additional liquidity needs.  It was established that the RCF Lenders were not willing to increase their lending to the Group.  However, in May, a number of holders of the Existing Notes (the "**Existing Noteholders**") formed a group (the "**Ad Hoc Group**")[6] in order to discuss the potential provision of additional funding and the amendments to the Existing Notes that would be required as a result.

21.    By mid-June, the Group's financial projections indicated that further liquidity would be required for general operational purposes over and above the EUR 100 million estimated need and that the Group would need part of the funding on an urgent basis before the end of July in order to meet its operating expenses and to allow it to pursue a more comprehensive debt restructuring.  In addition, it became evident during discussions with certain existing financial

---

[5] Concurrently with these discussions, the Group was able to reopen some of its venues and facilities with social distancing measures in place.  While such reopening has undoubtedly positively impacted the Group's prospects, it has been limited to Spain, Italy and certain assets in other markets and, as such, has not obviated the need for additional liquidity.

[6] Currently, the Ad Hoc Group holds, in the aggregate, 55% in amount of the Existing Notes, and includes the four largest Existing Noteholders, and another holder who is among the ten largest holders.

creditors that, in addition to liquidity for general operational purposes, the Group would need to raise enough funding to allow for the RCF to be repaid ahead of its original maturity in November 2021 (the RCF now has a maturity date of November 15, 2020 as explained below) as it is a condition of the RCF Lenders' consent to the Group incurring additional super senior debt that they are repaid in full from that debt.  As such, the Group sought to raise a total of EUR 250 million.

22.     In parallel to discussions and negotiations with the Ad Hoc Group, the Parent engaged independent financial advisers to seek to arrange alternative third-party financing. Detailed discussions ensued with potential financing providers.

23.     Following extensive discussions with the Ad Hoc Group, on July 13, 2020, the Group and the Ad Hoc Group agreed to a term sheet (the "**Amendments and New Money Term Sheet**") relating to the issuance of the Interim Notes.  The Amendments and New Money Term Sheet also contains the key commercial terms for certain amendments to the Existing Notes, including an extension of maturity, EUR 165 million of additional liquidity to be provided to the Group in the form of New York law governed notes to be issued by the Company (the "**New Notes**"), the repayment and discharge in full of the RCF and the payment of certain fees to certain Existing Noteholders and the Ad Hoc Group (collectively, the "**Transaction**").

24.     Despite extensive negotiations with potential alternative financing providers, no such provider was able to offer a solution that was as attractive, in economic terms, for the Group as the Transaction.

25.     On July 13, 2020, the Parent, certain other members of the Group, the Ad Hoc Group and the Information Agent (as defined below) entered into a lock-up agreement (the "**Original Lock-Up Agreement**") thereby confirming their commitment to support and take steps

to give effect to the terms of the Amendments and New Money Term Sheet, subject to the terms

of the Original Lock-Up Agreement and the Amendments and New Money Term Sheet.

26.      In order to extend the time period provided in the Original Lock-Up Agreement to

agree the documentation required for the Interim Notes to be issued, the relevant parties agreed to

certain amendments to the Original Lock-Up Agreement.  However, as certain of those consents

were provided after the Lock-Up Date (as defined in the Original Lock-Up Agreement), it was

necessary to enter into a revised lock-up agreement (the **"Revised Lock-Up Agreement"**) in place

of the Original Lock-Up Agreement reflecting those amendments and certain other required and

consequential amendments.  All of the initial parties to the Original Lock-Up Agreement entered

into the Revised Lock-Up Agreement on July 21, 2020.

27.      As of September 7, 2020, 81.27% by value of the Existing Noteholders have

acceded to the Revised Lock-Up Agreement.  The Revised Lock-Up Agreement obligates the

parties thereto to support the Transaction in good faith and to not otherwise proceed in a manner

adverse to the Scheme or the Transaction.

28.      On July 23, 2020, the Parent, the RCF Lenders and the RCF Agent, amongst others,

entered into a standstill, amendment and waiver agreement (the **"RCF Standstill"**). The RCF

Lenders provided certain waivers as part of the RCF Lenders' commitment to support the

Transaction and the issuance of the Interim Notes.  The Parent agreed to, among other things,

amend the maturity date of the RCF to November 15, 2020 (originally due to mature in November

2021).  Also pursuant to the RCF Standstill, the Parent and certain other members of the Group

provided various undertakings, including to apply the proceeds of the issuance of the New Notes

towards the repayment and discharge in full of the RCF.

29.    On July 29, 2020, pursuant to the Amendments and New Money Term Sheet, the Interim Notes were issued by Codere Finance to provide EUR 85 million to meet the Group's urgent liquidity need and to provide a stable platform from which the Group can launch the Scheme and pursue the Transaction.

**D.    Description of the Scheme**[7]

30.    The scheme document containing an explanation of the terms of the Scheme and additional background with respect to the Company and the English Proceeding (the "**Scheme Document**") is attached as Exhibit B to the White Declaration.

31.    In summary, the Scheme is being proposed in order to implement the following amendments to the Existing Notes (the "**Existing Notes Amendments**"):

a.    the extension of the maturity of the Existing Notes from November 1, 2021 to November 1, 2023;

b.    an increase in interest payable in respect of each series of Existing Notes as follows:

- Existing Euro Notes: a mandatory 4.50% cash pay coupon plus either (A) a further 5% cash pay coupon or (B) a further 6.25% PIK coupon, capitalizing on each coupon payment date, the election between (A) and (B) being at the option of Codere Finance; and

- Existing Dollar Notes: a mandatory 4.50% cash pay coupon plus either (A) a further 5.875% cash pay coupon or (B) a further 7.125% PIK coupon, capitalizing on each coupon payment date, the election between (A) and (B) being at the option of Codere Finance.

c.    the amendment of the covenants contained in the Existing Notes Indenture to allow additional super senior debt capacity in respect of the New Notes and include the additional restrictions to covenants and baskets as set out in the announcement made by the Parent on July 24, 2020.

---

[7] The below description is a high-level summary only, and is qualified in its entirety by the full terms of the Scheme.

32.    Assuming that the English Court approves the Scheme, the Existing Notes Amendments could be effected with the consent of 75% in value and a majority in number of the holders of the Existing Notes voting on the Scheme, rather than by holders of at least 90% in value of each series of Existing Notes, as would be required under the terms of the Existing Notes Indenture.[8]

33.    The Existing Notes Amendments do not directly result in additional liquidity being provided (although they will allow part of the applicable coupon to accrue as PIK rather than being entirely cash pay).  However, the effectiveness of the Existing Notes Amendments is a condition to completing the Transaction, which includes the additional liquidity to be provided by the New Notes.  As such, the success of the Group's restructuring as a whole is dependent on the Scheme becoming effective.  As discussed further below, the Transaction is also conditioned on obtaining the relief requested in this Motion.

34.    The Existing Notes Amendments will be binding on the Scheme Creditors with respect to the Debtor, as well as with respect to the other obligors that are party to the Existing Notes Indenture (i.e., Codere Finance, as co-obligor, and the Existing Notes Guarantors), and will have the effect of enjoining the Scheme Creditors from taking any action contrary to the Existing Notes Amendments (the "**Non-Debtor Modifications**").  The Scheme also provides for the waiver and release by Scheme Creditors of all Liabilities against each Released Person in relation to, or in connection with or by reason of or resulting directly or indirectly from a Released Person's participation (as applicable) in the negotiation, preparation, entry into and/or implementation of

---

[8] The Company considers the 90% threshold unlikely to be achievable because, while it is aware that there are certain Existing Noteholders with relatively large holdings of the Existing Notes, there are also a large number of Existing Noteholders with very small holdings.  As a logistical matter, the Company considers that it may be the case that a sufficient number of those smaller Existing Noteholders would not respond to the relevant consent requests so as to meet the 90% threshold.

the Scheme, the amendments to the Existing Notes or the issuance of the New Notes, in each case contemplated by the Scheme.[9]  Specifically, the Scheme Creditors agree, pursuant to a Deed of Release and the terms of the Scheme itself, that they will not commence or continue any claim, counterclaim or Proceedings against any Released Person in respect of any Liability waived, released or discharged under the Deed of Release (the "**Releases**").

35.   The Company believes that the extension of the maturity of the Existing Notes provided by the Existing Notes Amendments will provide the Group with the time it will need to normalize its business following the impact of the Covid-19 pandemic with a view to facilitating the refinancing of its debt on a going concern basis thereafter and that the terms of the Transaction, which is conditioned on the Existing Notes Amendments, are the most attractive terms for additional liquidity and offer the best holistic solution to the Group's existing capital structure. The Company also believes that engagement of certain holders of the Existing Notes (i.e., the Ad Hoc Group) in the Transaction provides compelling evidence of its stakeholders' continuing support of the Group and its prospects.

**E.   The English Proceeding**

36.   On August 6, 2020, the Company issued a practice statement letter (the "**Practice Statement Letter**") to all Existing Noteholders.  The Practice Statement Letter is attached as Exhibit A to the White Declaration.  Among other things, the Practice Statement Letter notified the Existing Noteholders of the Company's intention to propose the Scheme and apply to the

---

[9] Released Person is defined as "the Company; the Issuer; Codere Finance; the Parent; the Guarantors; each Scheme Creditor; each Nominated Participant; each Backstop Provider; each member of the Ad Hoc Group;  the Advisers; the Existing Notes Trustee; the New Notes Trustee; the Security Agent; the Registrar; the Transfer Agent; the Paying Agent; the Directors; the Information Agent; and the Escrow Agent, and each of their respective Affiliates, Related Persons, Related Funds, and all of their respective present, past or future partners, officers, Directors, employees, assigns, transferees, principals, agents, representatives and advisers."

English Court for, among other things, permission to convene the Scheme Meeting (as defined below). The Practice Statement Letter was distributed to the Existing Noteholders by GLAS Specialist Services Limited, in its capacity as the information agent under the Scheme (the **"Information Agent"**) via Euroclear Bank S.A./N.V. (**"Euroclear"**) and Clearstream Banking S.A. (**"Clearstream"**, together with Euroclear, the **"Clearing Systems"**) and to the Existing Notes Trustee and made available at https://glas.agency/2020/07/13/codere-s-a/. Announcements regarding the Practice Statement Letter were made via the Irish Stock Exchange where the Existing Notes are listed (through Walkers Capital Markets Limited as listing agent in respect of the Existing Notes); via the *Comisión Nacional de Mercado de Valores* (**"CNMV"**); and available on the 'CNMV Filings' section of the Group's website (https://www.grupocodere.com/en/shareholders-investors/cnmv-filings/).

37.     On August 25, 2020, the Company commenced the English Proceeding by applying to the English Court for permission to convene the Scheme Meeting. The application to the English Court was accompanied by a substantially finalized draft of the Scheme Document containing information regarding the Company and the Scheme. The English Court held a hearing (the **"Convening Hearing"**) on September 3, 4 and 7, 2020 and subsequently issued an order dated September 11, 2020 (the **"Convening Order"**), which, among other things, ordered the convening of a meeting of all persons who have a beneficial interest as principal in the Existing Notes as of 4:00 p.m. (London time) on September 25, 2020 (the **"Scheme Creditors"**) to consider and vote on the Scheme (the **"Scheme Meeting"**). At the Convening Hearing, one scheme creditor (the **"Objecting Scheme Creditor"**) (i) objected to the Debtor's proposal that the Scheme Creditors vote together as a single class in respect of the Scheme and (ii) claimed that the Practice Statement Letter was deficient in certain respects (and such deficiencies were mirrored in the Explanatory

Statement).  The Objecting Scheme Creditor asserted that the members of the Ad Hoc Group

should form one class and all other Scheme Creditors should form another class.  Having heard

the arguments, the English Court rejected the views of the Objecting Scheme Creditor, and ordered

that all Scheme Creditors vote together in one class as proposed by the Debtor.

38.     The Scheme Meeting will be held on September 29, 2020 at 2:00 p.m. (London

time).  A copy of the Convening Order is attached to the Foreign Representative Declaration as

Exhibit B thereto and the White Declaration as Exhibit C thereto.

39.     In the Convening Order, the English Court also confirmed the appointment of the

Foreign Representative by the Company to act as the foreign representative for purposes of

achieving recognition of the Scheme in the United States.  Convening Order ¶ 27 (declaring that

"[b]y a resolution passed by the Company's board of directors, Manuel Martinez-Fidalgo, or if he

is unable to so act, Matthew Charles Turner, has been validly appointed by the Company as agent

to seek relief available as a foreign representative for the purpose of seeking recognition of the

Scheme under Chapter 15 of the US Bankruptcy Code.").

40.     On September 14, 2020, and in accordance with the Convening Order, the Scheme

Document was posted to following website:  https://glas.agency/2020/07/13/codere-s-a/ (the

"**Scheme Website**").  In addition, as required by the Convening Order, the Scheme Document will

be distributed to Scheme Creditors as soon as reasonably practicable by the following methods: (i)

by the delivery of notices to the Clearing Systems for communication to Existing Noteholders; (ii)

via the Regulated News Service operated by the Irish Stock Exchange; (iii) as otherwise required

by the rules of the Irish Stock Exchange; (iv) via the Comisión Nacional de Mercado de Valores;

(v)   made   available   on   the   'CNMV   Filings'   section   of   the   Group's   website

(https://www.grupocodere.com/en/shareholders-investors/cnmv-filings/); and (vi) made available

on the Scheme Website.

41.    The Debtor anticipates that the English Court will hold a hearing to consider

sanctioning and approving the Scheme (the "**Sanction Hearing**") commencing on or around

October 6, 2020.  The Scheme Creditors and other creditors of the Debtor will have an opportunity

to be heard and raise objections at the Sanction Hearing.  If the English Court sanctions the Scheme

and issues an order to that effect (the "**Sanction Order**," and collectively with the Convening

Order and any other order that may be entered by the English Court, the "**English Orders**"), the

Scheme will become effective, and thereby binding as a matter of English law on all Scheme

Creditors, upon delivery of the Sanction Order to the Registrar of Companies of England and

Wales.  The Sanction Order is expected, among other things, to (i) sanction and approve

consummation of the Scheme, including all actions necessary to consummate the Existing Notes

Amendments, and (ii) authorize the Debtor, on behalf of each Scheme Creditor, to execute all

agreements and documentation necessary to consummate the Scheme, including the Existing

Notes Amendments and the Deed of Release.

42.    Because the Existing Notes are held through the Clearing Systems, it has not been

possible to identify all Scheme Creditors (*i.e.*, the persons or entities holding the Existing Notes).

Nonetheless, it is anticipated that certain of the Scheme Creditors are US persons or entities.  In

addition, the Existing Notes are governed by New York law and the Existing Notes Indenture

contains an exclusive New York choice of forum provision.  Accordingly, the Company is seeking

recognition and enforcement under chapter 15 in order to give effect to the Scheme in the United

States to (i) ensure orderly and consistent implementation of the Scheme, (ii) ensure that all of the

Scheme Creditors are treated consistently, regardless of where they are located, (iii) protect the

Debtor and the Group from any lawsuits in the United States from those who are bound by the terms of the Scheme and (iv) ensure that the Non-Debtor Modifications and Releases approved by the English Court through the Scheme will be enforceable within the United States.  Without recognition and enforcement of the Scheme, including the Non-Debtor Modifications and Releases, in the United States, Scheme Creditors may take action in the United States against the Company or its assets despite the terms of the Existing Notes Amendments imposed by the Scheme. Litigation and enforcement actions against the Company in the United States will undermine the Scheme and frustrate the Transaction.  Indeed, the completion of the Transaction is conditioned on obtaining the relief sought herein.

43.    As set forth below and in the Foreign Representative Declaration, all statutory elements for the relief requested herein are satisfied, and the Foreign Representative therefore respectfully requests that this Court grant the Motion, give full force and effect within the territorial jurisdiction of the United States to the Scheme (including the Non-Debtor Modifications and Releases) and Sanction Order and permanently enjoin parties from commencing or continuing any action or proceeding in the United States against the Company or its assets located in the United States that is inconsistent with the Scheme.

## **ARGUMENT**

A.    **The English Proceeding is Entitled to Recognition Pursuant to Section 1517 of the Bankruptcy Code as a Foreign Main Proceeding**

44.    Section 1517 of the Bankruptcy Code provides clear and objective standards that must be satisfied for recognition.  Specifically, section 1517 provides, in pertinent part, that "after notice and a hearing, an order recognizing a foreign proceeding shall be entered if – (1) such foreign proceeding … is a foreign main or foreign nonmain proceeding…; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the

requirements of section 1515." 11 U.S.C. §1517(a)(1)-(3). As more fully discussed below, the English Proceeding satisfies these standards and should be recognized as a foreign main proceeding.

### 1.    *The Debtor is Eligible to be a Debtor under the Bankruptcy Code*

45.    As a threshold issue, the Debtor is eligible to be a debtor under the Bankruptcy Code. Section 109(a) of the Bankruptcy Code provides, in relevant part that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." 11 U.S.C. § 109(a). Courts in this district have applied section 109(a) to chapter 15 eligibility. *See, e.g.*, *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013).

46.    Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors have held that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States. *See, e.g., In re B.C.I. Fins. Pty Ltd.,* 583 B.R. 288, 290 (Bankr. S.D.N.Y. 2018) ("As a general matter, courts that have construed the 'property' requirement in Section 109 'with respect to foreign corporations and individuals have found the eligibility requirement satisfied by even a minimal amount of property located in the United States.'").

47.    Here, the Company is eligible to be a debtor under section 109(a) because it has assets in the United States consisting of interest in certain funds deposited with Clifford Chance LLP as a retainer for its services, which funds are held in a client trust account in New York, New York. Foreign Representative Declaration ¶ 42. *See, e.g., In re Octaviar Administration Pty Ltd*, 511 B.R. 372–73 (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y.

2003)).  *See also In re Foreign Economic Industrial Bank Ltd, "Vneshprombank"*, 607 B.R. 160, 166, 171-172 (Bankr. S.D.N.Y. 2019) (retainer account sufficient to satisfy section 109(a)); *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017) (retainer suffices); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 31 (S.D.N.Y. 2018) (retainer suffices); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (granting recognition of a case where the foreign representative cited the presence of a retainer in New York).

48.     Additionally, the Existing Notes with respect to which the Company is an obligor are governed by New York law, and the Existing Notes Indenture contains an exclusive New York forum selection clause.    Foreign Representative Declaration ¶ 40.    Agreements containing jurisdiction provisions of this type have been found to give rise to property rights supporting debtor eligibility under section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re P.T. Bakrie Telecom TBK*, 601 B.R. 702, 714-715 (Bankr. S.D.N.Y. 2019) (retainer account and rights under an indenture with NY choice of law and choice of forum provisions satisfy section 109(a)); *In re Avanti Commc'ns*, 582 B.R. 603, 610–611 (Bankr. S.D.N.Y. 2018) (holding that a foreign debtor was eligible to be a debtor under section 109(a) because of intangible contract rights under a New York law-governed indenture); *In re Cell C Proprietary*, 571 B.R. 542, 552 (Bankr. S.D.N.Y. 2017) (funds in a retainer account and rights under New York law-governed notes satisfy section 109(a)); *In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015) (same).

49.     Accordingly, the Debtor meets the general eligibility requirements of section 109(a) of the Bankruptcy Code.

### 2.    The English Proceeding is a "Foreign Proceeding"

50.     The English Proceeding is a "foreign proceeding" as defined in the Bankruptcy Code.  The term "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code as:

> [A] collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization . . . ."
> 11 U.S.C. § 101(23).

51.     Courts have held that a foreign proceeding is one in which "acts and formalities

[are] set down in law so that courts, merchants and creditors can know them in advance, and apply

them evenly in practice".   *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009).   In

determining whether a specific proceeding is a "foreign proceeding" under section 101(23) of the

Bankruptcy Code, courts look to the following criteria: "(i) [the existence of] a proceeding; (ii)

that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign

country; (v) that is authorized or conducted under a law related to insolvency or the adjustments

of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a

foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation."   *In

re Ashapura Minechem Ltd.,* 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *Betcorp*).

52.     ***First***, the English Proceeding is a proceeding commenced under a statutory

framework set forth in the Companies Act, which sets forth the requirements for the Company to

apply to the English Court to initiate and implement the process by which a compromise or

arrangement between a company and its creditors can become binding on the company and all of

its affected creditors if approved by the requisite thresholds of creditors and sanctioned by the

court.   White Declaration ¶ 6.   *See Betcorp*, 400 B.R. at 278 ("the hallmark of a 'proceeding' is a

statutory framework that constrains a company's actions and that regulates the final distribution

of a company's assets").

53.     ***Second***, the English Proceeding is "judicial" as it has been commenced and is

pending before the English Court and the English Court must, among other things, sanction the

Scheme in order for the Scheme to become effective. *See* White Declaration ¶¶ 13-16. This Court has previously observed that "[t]here is significant judicial involvement in this scheme process" when analyzing a scheme of arrangement under an analogous law. *In re Board of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 52 (Bankr. S.D.N.Y. 1999) (granting recognition to a scheme of arrangement under Bermuda law pursuant to former section 304 of the Bankruptcy Code).

54.    ***Third***, the English Proceeding is "collective" in nature. A proceeding is "collective if it considers the rights and obligations of all creditors." *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), on reconsideration in part (Jan. 21, 2011), *subsequently aff'd*, 728 F.3d 301 (3d Cir. 2013) (citing *Betcorp*, 400 B.R. at 281). "The 'collective proceeding' requirement is intended to limit access to Chapter 15 to proceedings which benefit creditors generally and to exclude proceedings which are for the benefit of a single creditor." 8 COLLIER ON BANKRUPTCY ¶ 1501.03[1], 1501-7 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). U.S. courts have held schemes of arrangement to be collective in nature where all impacted creditors had a right to object to the proposed schemes and where the court was involved in approving the schemes. *See Avanti*, 582 B.R at 613. Here, all Scheme Creditors will be afforded the opportunity to attend the Scheme Meeting and vote on the Scheme and, if desired, ask questions and/or object to the Scheme before the English Court. The Scheme will only be approved by the English Court if the requisite majorities of voting Scheme Creditors approve the Scheme. After becoming effective, the Scheme will be binding on all Scheme Creditors. *See* White Declaration ¶ 16. The English Proceeding is therefore collective in nature.

55.    ***Fourth***, the English Court before which the English Proceeding is pending is located in a foreign country. The Convening Hearing was held before the English Court in the

United Kingdom, the Scheme Meeting will take place in England, and the Sanction Hearing will be held before the English Court in the United Kingdom. *See* White Declaration ¶ 18-20.

56. **Fifth**, the English Proceeding is being conducted under the Companies Act, a law relating to the adjustment of debts, for purposes of reorganization. *See* White Declaration ¶ 6. A scheme of arrangement is "…as a collective proceeding for the adjustment of debt…" *See Avanti*, 582 B.R at 614. *See also In re Swissport Fuelling Ltd*, Case No. 20-11524 (Bankr. S.D.N,Y. July 6, 2020); *In re Lecta Paper UK Ltd.*, Case No. 1913990 (Bankr. S.D.N.Y., Feb. 4, 2020); *In re Syncreon Auto. (U.K.) Ltd.*, Case No. 19-11702-BLS (Bankr. D. Del., Sep. 11, 2019).

57. **Sixth**, the Debtor's assets and affairs are subject to supervision of the English Court during the pendency of the English Proceeding. Among other things, the English Court must ultimately sanction the Scheme in order for the Scheme to become effective and the Company to obtain the relief sought. In addition, Scheme Creditors and other creditors will have the opportunity to seek the assistance of the English Court by raising objections or asking questions at the Sanction Hearing. *See* White Declaration ¶ 13.

58. **Seventh**, the English Proceeding is a proceeding for the purposes of reorganization. A scheme of arrangement is a statutory process under the applicable provisions of English law for, among other things, the restructuring of liabilities. White Declaration ¶ 6. Much like a plan of reorganization under the Bankruptcy Code, the English Proceeding is for the purpose of implementing a restructuring the Group's financial obligations in order to preserve the Group's status as a going concern. *See Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (citation omitted) ("[T]he purpose of a business reorganization is to restructure a business' [sic] finances to enable it to operate productively, provide jobs for its employees, pay its creditors and produce a return for its stockholders."). Here,

the Scheme Document confirms that implementation of the Transaction, which is conditioned on

the effectiveness of the Scheme, will "ensure the continuing operations of the Group for the benefit

of all stakeholders, with the key elements for a sustainable capital structure and a foundation from

which the Group can deliver long-term value for all of its stakeholders."  Scheme Document,

Section I, Part D, Clause 1.3.

59.     ***Finally***, courts have consistently recognized schemes of arrangement under the

laws of the United Kingdom as "foreign proceedings".  *See  In re Avanti Commc'ns Grp. PLC,* 582

B.R. 603 (Bankr. S.D.N.Y. 2018) ("Schemes of arrangement under UK law have routinely been

recognized as foreign proceedings in chapter 15 cases.") (citations omitted); *see also In re Lecta

Paper UK Ltd.*, No. 19-13990 (Bankr. S.D.N.Y., Feb. 4, 2020) (ECF No. 12); *In re Syncreon Auto.

(U.K.) Ltd*., No. 19-11702-BLS (Bankr. D. Del., Sep. 11, 2019) (ECF No. 37); *In re New Look

Secured Issuer plc*, No. 19-11005-SMB (Bankr. S.D.N.Y., May 3, 2019) (ECF No. 14); *In re

Stripes US Holding, Inc.*, No. 18-12388-CSS (Bankr. D. Del., Nov. 13, 2018) (ECF No. 23); *In re

New World Res. N.V*., No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF No. 20); *In re

hibu, Inc.*, No. 14-70323-REG (Bankr. E.D.N.Y. Feb. 27, 2014) (ECF No. 29); *In re Magyar

Telecom B.V.*, No. 13-13508-SHL, 2013 WL 10399944 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re

Highlands Ins. Co. (U.K.)*, No. 07-13970-MG (Bankr. S.D.N.Y. Jan. 23, 2008) (ECF No. 23).

### 3.     *The English Proceeding is a "Foreign Main Proceeding"*

60.     The  Foreign  Representative  respectfully  submits  that  the  Court  should  grant

recognition of the English Proceeding as a "foreign main proceeding" as defined in section 1502(4)

of the Bankruptcy Code.  The Bankruptcy Code provides that a foreign proceeding is a "foreign

main proceeding" if it is pending in the country where the debtor has the center of its main interests.

11 U.S.C. § 1517(b)(1).

61.     Section 1516(c) of the Bankruptcy Code contains a presumption that, absent evidence to the contrary, a debtor's registered office is the center of its main interests. *See* 11 U.S.C. § 1516(c); s*ee also In re Bear Stearns*, 374 B.R. 122, 127 (Bankr. S.D.N.Y 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).  Here, the Debtor's center of main interest is in the United Kingdom. Specifically, the Debtor is formed under the laws of England and Wales and its registered office is at Suite 1, 3rd Floor, 11-12 St. James Square, London, SW1Y 4LB.  Foreign Representative Declaration ¶ 7.  Therefore, absent evidence to the contrary, the Debtor's center of main interests is presumed to be in the United Kingdom.

62.     In addition, other factors that may be weighed in considering a debtor's center of main interests include "the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re Bear Stearns*, 374 B.R. at 128 (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007)).  Courts also take into consideration the expectations of creditors and other interested parties as the company's center of main interest must be "ascertainable to third parties." *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 136-38 (2d Cir. 2013); *In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012).

63.     The analysis of a foreign debtor's center of main interests is a flexible one, as "courts do not apply any rigid formula or consistently find one factor dispositive." *Betcorp*, 400 B.R. at 290.  When applying this totality of the circumstances test, courts "generally equate the center of main interests with the concept of a 'principal place of business' under United States

law." *See, e.g.*, *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) (noting that "plain English" meaning of "center of main interests" in American jurisprudence is "principal place of business" and that courts have used such terms "interchangeably").

64.     Consideration of these other factors support the conclusion that the Debtor's center of main interests is in the United Kingdom.  In addition to the Debtor being a company organized under the laws of England and Wales with its registered office in England, its only two directors are residents of the United Kingdom and Company mail is received at the Debtor's London address. The United Kingdom clearly is "ascertainable by third parties" as the Debtor's center of main interests.

65.     The Foreign Representative respectfully submits that the Court should grant recognition of the English Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

### 4.     The Petitioner is a "Foreign Representative"

66.     Section 101(24) of the Bankruptcy Code defines who can act as a foreign representative with respect to a foreign proceeding.   Specifically, section 101(24) of the Bankruptcy Code provides that:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

67.     The Foreign Representative need not be approved by the foreign court or administrative body and may be appointed by a debtor's board of directors.  *See Ad Hoc Group of*

*Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408, 412 (N.D.

Tex. 2012), *aff'd*, 701 F.3d. 1031 (5th Cir. 2013), cert. dismissed, 133 S. Ct. 1862 (2013).

68.    Here, the Petitioner is an individual who has been authorized and empowered by

the Company's board of directors to act as a foreign representative in the Debtor's chapter 15 case.

*See* Foreign Representative Declaration ¶¶ 2, 46.  The Convening Order confirms this appointment

and authority.  *See* White Declaration ¶ 18.  Accordingly, the Petitioner is an authorized foreign

representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

### 5.    *The Foreign Representative Properly Commenced this Chapter 15 Case*

69.    This chapter 15 case was duly and properly commenced as required by section 1504

of the Bankruptcy Code by filing a petition for recognition pursuant to section 1515(a) of the

Bankruptcy Code.  Pursuant to section 1515(b) of the Bankruptcy Code, a petition for recognition

must be accompanied by one of the following:

1.  a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

2.  a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

3.  in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

70.    A true and correct copy of an extract of the minutes of a meeting of the Debtor's

board of directors reflecting the appointment of the Petitioner is attached to the Foreign

Representative Declaration as Exhibit A thereto.  In addition, a copy of the Convening Order

commencing the English Proceeding is attached to the Foreign Representative Declaration as

Exhibit B thereto and the White Declaration as Exhibit C thereto.  The Convening Order, among

other things, confirms the appointment of the Petitioner as the foreign representative.

71.     The Chapter 15 Petition was accompanied by all fees, documents and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), including: (a) a certified copy of the Convening Order; (b) lists pursuant to Bankruptcy Rule 1007(a)(4)(B) containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtor, (ii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code, and (iii) all parties to litigation pending in the US to which the Debtor is a party as of the date of the petition for recognition; (c) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; and (d) a statement identifying all foreign proceedings with respect to the Debtor that are known to the Foreign Representative.

72.     Having filed the above-referenced documents and because this Court is entitled to presume the authenticity of such documents filed in connection with a chapter 15 petition under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of the Bankruptcy Code have been satisfied.

**B.     The Debtor Is Entitled to Automatic Relief Under 11 U.S.C. § 1520**

73.     Section 1520(a) of the Bankruptcy Code sets forth statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, see 11 U.S.C. § 1520(a), including the application of the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property within the territorial jurisdiction of the United States.  Thus, once the Court recognizes the English Proceeding as a foreign main proceeding, no further showing is required to obtain such protections.

**C.      Enforcement of the English Orders and Scheme and Related Discretionary Relief Is Proper**

74.      The Foreign Representative respectfully requests that the Court provide for enforcement in the United States of the Scheme and the English Orders to assist in the effective implementation of the Scheme and the Transaction.

75.      U.S. bankruptcy courts have routinely held that recognizing and enforcing a foreign plan and confirmation order is appropriate under sections 1521 and 1507 of the Bankruptcy Code. *See In re Avanti Commc'ns*, 582 B.R. 603, 616 (Bankr. S.D.N.Y. 2018) ("Cases have held that in the exercise of comity that appropriate relief under section 1521 or additional assistance under section 1507 may include recognizing and enforcing a foreign plan confirmation order.") (citing *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017)). *See, e.g.*, *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing the order of the South African Court sanctioning a scheme of arrangement); *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014) (enforcing Brazilian reorganization plan and enjoining acts in contravention thereof); *In re Mercantile & General Reinsurance Co. Ltd*, Case No. 05-14076 (BRL) (Bankr. S.D.N.Y. Sept. 7, 2005) (ECF No. 16) (granting recognition to scheme of arrangement sanctioned in Scottish high court and entering permanent injunction in support of such scheme); *The Argo Fund Ltd. V. Bd. of Dirs. of Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that the bankruptcy court did not abuse its discretion in granting full force and effect to Argentine plan and approval order in the United States); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 31 (S.D.N.Y. 2018) (recognizing and enforcing Cayman schemes and orders of Cayman court sanctioning same); *In re Boart Longyear Ltd.*, Case No. 17-11156 (MEW) (Bankr. S.D.N.Y. Aug. 30, 2017) (ECF No. 45) (recognizing and enforcing

order of Supreme Court of New South Wales sanctioning Australian schemes of arrangement); *In re Mood Media Corp.*, Case No. 17-11413 (MEW) (Bankr. S.D.N.Y. June 28, 2017) (ECF No. 44) (recognizing and enforcing Canadian plan of arrangement and Canadian court order approving same); *In re Pac. Expl. & Prod. Corp.*, Case No. 16-11189 (JLG) (Bankr. S.D.N.Y. Oct. 3, 2016) (ECF No. 31) (same); *In re Kaisa Grp. Holdings Ltd.*, Case No. 16-11303 (SHL) (Bankr. S.D.N.Y. July 14, 2016) (ECF No. 22) (recognizing and enforcing Hong Kong scheme and Hong Kong scheme sanction order).

76.     Moreover, U.S. bankruptcy courts (including in this District) have recognized and given full force and effect to foreign plans and schemes of arrangement (including English schemes of arrangement) that have included modification and releases of the rights of scheme creditors against non-debtor third parties. *See e.g.*, *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 698-99 (Bankr. S.D.N.Y. 2010) (approving a Canadian plan that included releases of counterparties to swap transactions with the debtor); *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013) (enforcing foreign order containing third-party release of debtor's external auditor); *Avanti*, 582 B.R. at 615 (recognizing and enforcing UK scheme of arrangement containing third-party release of debtor's direct and indirect non-debtor subsidiary guarantors); *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF No. 20) (recognizing and enforcing UK scheme of arrangement releasing debtor's non-debtor subsidiary guarantors); *In re Agrokor D.D.*, 591 B.R. 163 (Bankr. S.D.N.Y. 2018) (enforcing third-party release granted in foreign main proceeding); *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162 (3d Cir. 2018) (enforcing Canadian restructuring plan and including release and injunctive provisions); *In re Rede Energia S.A.*, 515 B.R. at 93 (granting recognition and enforcement of Brazilian restructuring plan and enjoining acts in contravention of the plan); *In re Codere Finance (UK) Ltd.*,

Case No. 15-13017-JLG (Bankr. S.D.N.Y. 2015) (ECF No. 16) (recognizing and enforcing UK scheme of arrangement releasing, among others, a non-debtor co-issuer of the debtor's notes and affiliate guarantors of the same); *In re Towergate Fin. plc*, Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF No. 16); (recognizing and enforcing UK scheme of arrangement releasing, among other entities, the parent of the debtor together with its affiliates); *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF No. 26) (recognizing and enforcing UK scheme of arrangement releasing, among other entities, the non-debtor subsidiary guarantors of the debtor); *In re Ballantyne Re plc*, 19-11490-JLG (Bankr. S.D.N.Y. June 12, 2019) (ECF No . 28) (recognizing and enforcing English scheme of arrangement releasing, among other entities, third party insurers and advisors thereto); *In re Hibu Inc.*, Case No. 14-70323 (REG) (Bankr. E.D.N.Y. Feb. 27, 2014) (ECF No. 29) (recognizing and enforcing UK scheme of arrangement releasing the debtor's lenders).

77.     Here, enforcement in the United States is required to prevent individual Scheme Creditors from acting to frustrate the purposes of the Scheme and the broader Transaction.  If Scheme Creditors could evade the terms of the Scheme by commencing actions in the United States, the Debtor and Codere Finance could face claims from Scheme Creditors that contravene the Existing Notes Amendments.  This could jeopardize the entire Transaction and, therefore, the Debtor's going concern status.  Further, certain creditors could obtain more than they are entitled to under the Scheme to the detriment of other Scheme Creditors, and the Debtor and other members of the Group would be required to defend such proceedings, thereby depleting the resources of the business.  For these reasons, among others, the completion of the Transaction is conditioned on recognition and enforcement in the United States.

### 1.    *The Court May Grant the Requested Relief Pursuant to Section 1521*

78.    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  11 U.S.C. §§ 1521(a), 1522(a); *see also Avanti*, 582 B.R. at 612 ("The discretion that is granted is exceedingly broad, since a court may grant any appropriate relief that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.") (internal citations omitted).  Such relief may include:

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a).

11 U.S.C. § 1521(a).  The Court may grant relief under section 1521(a) if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Although the Bankruptcy Code does not define "sufficient protection," legislative history indicates that a foreign plan may be approved unless "it is shown that the . . . proceeding

is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, pt. 1, at 116

(2005). Courts have also explained "sufficient protection" as:

> embodying three basic principles: '[(i)] the just treatment of all
> holders of claims against the bankruptcy estate, [(ii)] the protection
> of U.S. claimants against prejudice and inconvenience in the
> processing of claims in the [foreign] proceeding, and [(iii)] the
> distribution of proceeds of the [foreign] estate substantially in
> accordance with the order prescribed by U.S. law.'

*In re ENNIA Caribe Holding N.V.*, Case No. 18-12908 (MG) 2019 WL 365749, at *5 (Bankr.

S.D.N.Y. Jan. 29, 2019) (quoting *In re Atlas Shipping*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009)

(quoting *In re Artimm, S.r.L.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005))).

79.     Here, all creditors are "sufficiently protected" by the Scheme and the English

Proceeding.    All Scheme Creditors have received notice of the Scheme and will have an

opportunity to vote whether to accept or reject the Scheme.   The Scheme is ultimately subject to

the control and supervision of the English Court and objecting parties will have, at the Convening

Hearing, and will have again, at the Sanction Hearing, the opportunity to object and be heard prior

to the English Court's decision whether or not to exercise its discretion to sanction (approve) the

Scheme.    All similarly situated Scheme Creditors will be treated similarly, and there is no

contention that the U.S. claimants are being subjected to prejudice or inconvenience.   Hence, the

Scheme and Sanction Order, once entered, will be the result of a proceeding (the English

Proceeding) in which all creditors were treated fairly and justly, in compliance with English law.

*See, e.g.*, *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) ("The 'just

treatment' factor is satisfied upon a showing that the applicable law 'provides for a comprehensive

procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its

creditors'") (citing *In re Treco*, 240 F.3d 148, 158 (2d Cir. 2001)); *In re Culmer*, 25 B.R. 621, 629

(Bankr. S.D.N.Y. 1992).

80. Finally, the relief requested here clearly furthers the goals and purposes of chapter 15 itself. *See* 11 U.S.C. § 1501 (explaining that chapter 15's "objectives" include "cooperation between (A) courts of the United States . . . and (B) the courts and other competent authorities of foreign countries"). Recognition of the English Proceeding and enforcement of the Scheme and the English Orders would foster cooperation between the English Court and United States courts. By recognizing the English Proceeding and enforcing the Scheme, this Court would be assisting the English Court in the implementation of the English Orders.

### 2. *The Court May Grant the Requested Relief Pursuant to Section 1507*

81. In granting discretionary relief, the Court may also act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law. 11 U.S.C. § 1507(a). The legislative history of section 1507 states that it provides authority for "additional relief" beyond that permitted under sections 1519 to 1521. Section 1507(b) provides that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

82.     Courts have held that principles of comity are key to determining whether to grant additional assistance. *See, e.g.*, *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative."); *In re Atlas Shipping*, 404 B.R. at 738 (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity") (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008)).

83.     As discussed above, the relief requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to the Existing Notes Amendments and implementation of the Scheme.

84.     As the Second Circuit has recognized, "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987); *see also Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."). Over a hundred years ago, the Supreme Court recognized the need to give effect to foreign schemes of arrangement in order to further these goals, reasoning that

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

*Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883). If this Court refuses to enforce the Scheme in the United States, Scheme Creditors may pursue claims against the Debtor and other members of the Group, thereby threatening the restructuring contemplated by the Scheme as sanctioned by the English Court.

### 3.    *Injunctive Relief is Appropriate*

85.    To the extent the standards for injunctive relief apply in this chapter 15 case to the relief requested, those standards are met. To obtain a permanent injunction, a movant must demonstrate that (i) an injunction is required to avoid irreparable harm and (ii) there is a likelihood of success on the merits. *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). With respect to the second factor, the Foreign Representative seeks injunctive relief enforcing the Scheme and the Sanction Order in the United States only upon recognition thereof as part of the Proposed Recognition Order. Therefore, at the time such discretionary relief is granted, the requirement that the movant succeeds on the merits will be satisfied.

86.    With respect to the first factor, irreparable harm to an estate exists where the "equitable and orderly distribution of a debtor's property" are disrupted. *Victrix*, 825 F.2d at 713-14. *See also In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("irreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum" (quoting 2 Collier on Bankruptcy ¶ 304.05, at 304-21 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); *In re Rubin*, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) ("[T]here appears to be little dispute regarding the notion that the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury," quoting *In re Lines*, *infra*); *In re Brierley*,

145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution of assets in a single case.") (internal quotation marks and citation omitted); *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

87.     Courts in this District have thus repeatedly recognized their authority to grant injunctive relief to enforce foreign plans and discharges. *See, e.g.*, *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25 (Bankr. S.D.N.Y. 1999) (extending injunction of Bermuda court to prohibit any creditor from commencing or continuing actions in the United States contrary to the Bermudan plan); *Brierley*, 145 B.R. at 168-69 (granting permanent injunction prohibiting suits against the foreign debtor, its property or its administrators arising out of claims which could have been asserted prior to the filing of the ancillary petition); *see also In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162 (2d Cir. 2008) (bankruptcy court properly exercised discretion in granting full force and effect to an Argentine plan and approval order in the United States); *In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) ("The request by the Foreign Representative that the Court . . . enjoin acts in the U.S. in contravention of the [foreign confirmation decision] is relief of a type that courts have previously granted under section 304 of the Bankruptcy Code and other applicable law.") (citing *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d at 174–76); *In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce Canadian plan); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (same).

88.     As discussed above in the context of demonstrating that enforcement of the Scheme is appropriate, an injunction enforcing the terms of the Scheme and the English Orders in the

United States is necessary to prevent Scheme Creditors from seeking to obtain judgments in the United States against the Debtor and the Group to obtain greater recoveries than those to which they are entitled under the Existing Notes Amendments. Allowing creditors to relitigate issues resolved pursuant to the Scheme and English Orders in the United States would threaten the success of the Scheme and the broader Transaction and cause "irreparable harm" to the Debtor.

89.     The granting of the requested relief, conversely, would protect the interests of the Scheme Creditors by promoting the restructuring of the Debtor's financial obligations to accommodate the liquidity provided by the New Notes and preserve the Group's going concern status and ensuring that creditors are treated on a consistent, nondiscriminatory basis in accordance with the terms of the Scheme.

**D.      The Relief Requested Is Not "Manifestly Contrary to the Public Policy of the United States"**

90.     Granting the relief requested is entirely consistent with U.S. public policy of respecting foreign proceedings as codified in chapter 15 of the Bankruptcy Code. The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (i) cooperation between (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.

91.     While section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the Court from refusing to take an action otherwise required therein if such action would be manifestly contrary to the public policy of the United States, the public policy exception

is to be construed narrowly and applied sparingly. *In re Toft*, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011). *See also In re Fairfield Sentry Ltd*., 714 F.3d 127, 139 (2d Cir. 2013) (observing that the federal courts generally read the public policy exception "'restrictively'" and invoke it "only 'under exceptional circumstances concerning matters of fundamental importance for the enacting State'" (quoting Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ¶ 89)); H.R. Rep. 109-31(1), 109 Cong., 1st Sess. 2005, *reprinted in* 2005 U.S.C.C.A.N. 88, 169 at 172 ("The word 'manifestly' [used in section 1506] in international usage restricts the public policy exception to the most fundamental policies of the United States.").

92.     To determine whether relief would be manifestly contrary to U.S. public policy, courts consider "(1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of foreign main proceeding under Chapter 15 would 'severely hinder United States bankruptcy court' abilities to carry out . . . the most fundamental policies and purposes' of these rights." *In re British Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 717 (Bankr. S.D. Fla. 2010).  Under this standard, the mere fact that a foreign representative requests relief that would not be available in the United States is not grounds for denying comity under section 1506. *See In re Bd. of Dirs. of Telecom Arg., S.A.,* 528 F.3d at 173 (stating that comity "does not require that foreign proceedings afford a creditor identical protections as under U.S. bankruptcy law"); *Metcalfe & Mansfield*, 421 B.R. at 697 ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); *In re OAS S.A.*, 533 B.R. 83, 105 (Bankr. S.D.N.Y. 2015) ("Although Brazilian law may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy Law is manifestly contrary to our own public policy."); *In re Rede Energia S.A.*, 515 B.R. at 97 (finding that a Brazilian reorganization plan that violated the

Bankruptcy Code's "absolute priority rule" was not manifestly contrary to public policy because creditors had a full and fair opportunity to participate in the Brazilian bankruptcy proceedings and Brazilian bankruptcy law meets U.S. fundamental standards of fairness and accords with the course of civilized jurisprudence). Courts have gone so far as to hold that even the absence of a jury trial right—a right embodied in the U.S. Constitution— in a foreign proceeding would not justify the court's refusal to recognize the foreign proceeding pursuant to the public policy exception. *See In re Ephedra Products Liab. Litig.*, 349 B.R. 333, 335-36 (Bankr. S.D.N.Y. 2006).

93.     As discussed above, U.S. courts have previously exercised their "related to" jurisdiction  and recognized and given full force and effect to numerous foreign plans and orders that include third-party releases of non-debtor entities.  No court has found that such relief is manifestly contrary to U.S. public policy. *See In re Sino-Forest Corp.*, 501 B.R. at 665 (holding that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy").

94.     Indeed, in *Metcalfe & Mansfield*, it was held that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions [appropriately granted in a foreign proceeding], even if those provisions could not be entered in a plenary chapter 11 case." 421 B.R. at 696.  Similarly, in *Avanti*, it was found that the failure of a U.S. bankruptcy court to enforce releases of non-debtor guarantors could result in prejudicial treatment of creditors to the detriment of the debtor's reorganization efforts and prevent the fair and efficient administration of its restructuring.  582 B.R. 603, 618 (Bankr. S.D.N.Y. 2018).  In both cases, the court relied on the fact that the affected creditors had a full and fair opportunity to be heard in a manner consistent with U.S. due process standards. *See id.*; *Metcalfe*, 421 B.R. at 700. *See also*

*Agrokor* 591 B.R. at 189-90 (holding that foreign restructuring plans that include third-party releases are entitled to comity if creditors had a full and fair opportunity to vote and be heard).

95.     The Non-Debtor Modifications and Releases are permitted under English law, and the English Proceeding and relevant English law comports with U.S. standards of due process. White Declaration ¶ 21.  The provisions of the Convening Order ensured that Scheme Creditors were properly notified of the Scheme Meeting, and Scheme Creditors have the opportunity to raise questions and objections to the Scheme at the Scheme Meeting and/or at the Sanction Hearing. White Declaration ¶ 10, 13, 19.

96.     Failure to enforce the Non-Debtor Modifications and Releases could result in prejudicial treatment of certain creditors and parties in interest to the detriment of the Debtor's restructuring efforts and will prevent the fair and efficient administration of the Scheme and the Transaction.  *See Avanti*, 582 B.R. at 606 ("Without releasing those guarantees, it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the group to meet its restructured debt obligations.").  If the Court declines to enforce the Non-Debtor Modifications and Releases, then certain Scheme Creditors or other entities could seek to obtain judgments in the United States against the Debtor or other Released Persons to obtain greater recoveries than those to which they are entitled under the Scheme.

97.     The Releases are also necessary to facilitate the support of certain parties in interest who may be at risk of litigation without such Releases, or who otherwise view the Releases as a form of consideration for their support of the Transaction.  If the Scheme Creditors can effectively evade the terms of the Scheme and the Transaction by commencing actions in the United States,

the Released Persons involved in the Transaction would be required to defend any such proceedings and could seek reimbursement or indemnification from the Group, which would deplete the resources of the restructured business.

98.     Thus, in order for the Company to fairly and efficiently achieve the additional liquidity necessary and related restructuring of its financial obligations pursuant to the Transaction, and in furtherance of the goals and purpose of chapter 15, the Scheme, including the Non-Debtor Modifications and Releases, must be enforced in the United States.

**E.     Chapter 15 Case Closure**

99.     The primary purpose of this chapter 15 case is to obtain the relief requested in the Proposed Recognition Order.  The Foreign Representative does not anticipate requiring any further relief from this Court or foresee any reason for the chapter 15 case to remain open upon entry of the Proposed Recognition Order and such order becoming final and non-appealable.

100.     Section 1517(d) of the Bankruptcy Code provides that "[a] case under this chapter [15] may be closed in the manner prescribed under section 350," which, in turn, provides that a case may be closed "[a]fter an estate is fully administered." Although a chapter 15 case has no "estate" per se, *see In re Fairfield Sentry Ltd.*, 458 B.R. 665, 683 (S.D.N.Y. 2011), a party may apply for an order closing a bankruptcy case after substantially all issues have been resolved and the plan has been substantially consummated.  *In re A.H. Robins Co.*, 219 B.R. 145 (10th Cir. 1998).

101.     Bankruptcy Rule 5009(c) provides that the foreign representative shall "file a final report when the purpose of the representative's appearance in the court is completed.  The report shall describe the nature of the results of the representative's activities in the court." Fed. R. Bankr. P. 5009(c).  Rule 5009(c) further provides that, if no objection to a final report is filed within 30 days, the estate is presumed to have been fully administered.  *Id*.

102.    Further, Local Bankruptcy Rule 5009-2(a) provides, "[i]n case under chapter 15 of the Bankruptcy Code, the Court shall close the case when there is a presumption under Bankruptcy Rule 5009(c) that the case has been fully administered or the Court, after notice and a hearing, determines that the purpose of the foreign representative's appearance in the chapter 15 case has been completed, whichever is earlier."

103.    Here, the facts set forth in this Chapter 15 Petition demonstrate that this case will be fully administered upon the Proposed Recognition Order becoming final and the purpose of the Foreign Representative's request will have been completed.  The Proposed Recognition Order provides for the relief that the Foreign Representative requires in relation to the English Proceeding, Scheme and Sanction Order.  Accordingly, there does not appear to be any reason for this chapter 15 case to remain open after the Proposed Recognition Order is entered and becomes final and non-appealable and the requirements of section 350(a) of the Bankruptcy Code will have be satisfied.

## NOTICE

104.    The Foreign Representative proposes to notify creditors and parties in interest of the filing of the Chapter 15 Petition and the Foreign Representative's request for entry of the Proposed Recognition Order in the form and manner set forth in the *Foreign Representative's Motion for Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice*, which was filed contemporaneously herewith.  In light of the nature of the relief requested herein, the Foreign Representative submits that no other or further notice of the Chapter 15 Petition or the Proposed Recognition Order is necessary or required.

## NO PRIOR REQUEST

105.    No previous request for the relief sought in this Chapter 15 Petition has been made to this or any other court.

## **CONCLUSION**

WHEREFORE, the Foreign Representative respectfully requests that the Court: (a) enter the proposed order, upon notice and a hearing, substantially in the form attached hereto as **Exhibit A**, (b) authorize the Foreign Representative to seek entry of the Proposed Final Order attached hereto as **Exhibit B** to close this chapter 15 case upon notice of presentment, and (c) grant such other and further relief as may be just and proper.


Dated:    New York, New York
          September 14, 2020

Respectfully submitted,

/s/ Michelle M. McGreal
CLIFFORD CHANCE US LLP
Jennifer C. DeMarco
Michelle M. McGreal
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 878-8000

*Attorneys for the Foreign Representative*